OUACHITA VALLEY BANK *v.* DeMOTTE.

Opinion delivered March 14, 1927.

1. GUARANTY—CONSTRUCTION.—In ascertaining the meaning of a contract of guaranty, the same rules control as apply in other contracts, and the important question is to determine and give effect to the intention of the parties, as ascertained by a reasonable interpretation of the terms used when read in the light of the attendant circumstances and the purposes for which the guaranty was made.

2. GUARANTY—NOTICE OF ACCEPTANCE.—Where a bank, pursuant to request, telegraphed that it would honor a draft for a shipment, this was not a mere offer of guaranty, but an absolute undertaking, and no notice of acceptance was necessary.

3. GUARANTY—ACCEPTANCE AND CONSIDERATION.—Where a bank guaranteed to honor a broker's draft for goods shipped to the bank's customer, the shipper's act in shipping goods according to the terms of the guaranty was itself an acceptance, and furnished a consideration making the guaranty binding.

4. GUARANTY—RIGHT TO CANCEL.—Where a bank guaranteed to honor a draft in payment of a shipment of goods, it could not cancel the guaranty after the goods were shipped and the draft drawn in payment therefor.

5. GUARANTY—WAIVER.—After a bank had breached its guaranty to honor a draft for goods shipped, the shipper did not waive his rights under the guaranty by stopping the shipment *in transitu,* nor by subsequently allowing the goods to go forward after assurance of payment by the bank.

Appeal from Ouachita Circuit Court, Second Division; *W. A. Speer,* Judge; affirmed.

*Gaughan & Sifford,* for appellant.

*J. Bruce Streett* and *W. Garland Streett,* for appellee.

WOOD, J.   The facts are correctly stated by counsel for appellee as follows:   About May 26, 1923, the Camden Tool & Supply Company applied to one C. O. Gillman, a broker in Texas, for quotations on two carloads of 15½-inch iron pipe, approximately 1,200 feet, f.o.b. cars at point of shipment.   Gillman applied to the Acme Supply Company to purchase such pipe, and they agreed to sell it to him at $3.15 per foot, taking his draft on the Camden Tool & Supply Company in payment, provided he secured a guaranty from a Camden bank that the draft would be paid.

Gillman thereupon quoted the pipe to his customer at $3.40 per foot, allowing him 25 cents for his profit.   A. C. Page, doing business under the trade name of Camden Tool & Supply Company, hereafter called Page, accepted this offer, and, at his request, the Ouachita Valley Bank sent to the Commercial State Bank of Cisco, near where the pipe was to be shipped, the following telegram: "Commercial State Bank, Cisco, Texas.   Will honor C. O. Gillman draft bill of lading attached on Camden Tool & Supply Company for two cars of approximately twelve hundred feet fifteen half seventy-pound three dollars forty cents per foot f. o. b. cars, subject to C. O. Gillman inspection and indorsement of shipper's order bill of lading.   (Signed) Ouachita Valley Bank."

Upon receipt and inspection of this telegram, plaintiff agreed to sell and have shipped the amount and kind of pipe required. The carload in controversy was loaded and shipped out of Gorman, Texas, on June 12. Page wrote Gillman, on June 11, to hurry up the shipment, and received a reply about that time notifying him that one car had been shipped. About this time Page and the Ouachita Valley Bank had gotten into a lawsuit involving a car shipped to Page from Pioneer, Texas, and the defendant bank decided to cancel all guaranties on pipe shipments from Texas points, and, on June 15, 1923, wired the Commercial State Bank canceling its guaranty of May 26. About three days before this notice of cancellation was sent one carload of 600 feet of pipe had been shipped and a draft was drawn by C. O. Gillman in favor of the Commercial State Bank, with shipper's order bill of lading attached. This draft was forwarded by the Commercial State Bank to the Ouachita Valley Bank for collection, for account of the Acme Supply Company. Payment was refused, and the draft and bill of lading returned to the Cisco Bank and by it turned over to the plaintiff.

Thereupon, on June 16, plaintiff, as holder of the bill of lading, stopped the car at Fort Worth, and notified Gillman of the refusal of the defendant to honor his draft and of plaintiff's action in stopping the shipment. The guaranty having been canceled, the second car was not shipped out. After stopping the car, plaintiff called the defendant bank over the telephone and asked for an explanation of its refusal to pay the draft, and Mr. Brown, president of the said bank, told him that it had had trouble over the title to another car shipped by Gillman, and had canceled all guaranties in consequence. Plaintiff told him that this shipment had been made before such cancellation, and Brown then told him to let the shipment come forward and bank would pay the draft on arrival of car. Plaintiff then explained to the bank, since the draft had been turned down, he was already out

the freight from Gorman to Fort Worth, and loading charges, and that he stood on his original contract. Gillman then had a conversation with Brown, pursuant to which the bank wired him a guaranty that it would pay $600 to cover freight from Gorman to Camden and return if he would have plaintiff permit the car to come forward. Thereafter, on June 25, the car was released, and reached Camden July 6. When the car reached Camden, Mr. Sayles, for the plaintiff, presented the original draft with bill of lading attached, to the defendant, and W. W. Brown, the president, refused payment upon the ground that the bank's guaranty was canceled before the shipment. Payment of the $600 to cover freight to return the car to Gorman was then demanded and refused. Effort was then made to sell the pipe in the Camden territory, and, failing in this, it was reshipped to El Dorado, and finally sold there for $1,410.30, entailing a loss to plaintiff of the amount alleged in its complaint as amended on the trial.

Thereafter Paul DeMotte, doing business under the firm name of Acme Supply Company, instituted this suit. The cause was submitted to the court, and judgment rendered for plaintiff, and defendant appealed.

The rights of the parties to this action depend primarily upon the construction of the telegram above set forth. In 28 C. J., at page 930, Mr. Skyles, the author of the article on "Guaranty," lays down the following rule for the construction of such contracts: "In ascertaining the meaning of the language of a contract of guaranty, the same rules of construction control as apply in the case of other contracts. In accordance with such rules the important question is, if possible, to determine and give effect to the intention of the parties, as ascertained by a fair and reasonable interpretation of the terms used and the language employed in the contract of guaranty, as read, when necessary, in the light of the attendant circumstances and the purposes for which the guaranty was made." Numerous authorities are collated in the footnotes to the text.

The telegram under review, though addressed to the Commercial State Bank of Cisco, Texas, is in the nature of a general guaranty that appellant will pay the draft of C. O. Gillman on the Camden Tool & Supply Company to any one who will furnish or sell to C. O. Gillman for the Camden Tool & Supply Company the goods therein mentioned, after the same had been inspected by Gillman under the terms therein expressed. It is in the nature of a letter of credit by which the appellant proposes to stand as surety or guarantor for Gillman for the purchase price of two cars of approximately 1,200 feet of 15½-inch seventy-pound iron pipe at $3.40 per foot f.o.b. cars, after Gillman had inspected the same and indorsed the shipper's order bill of lading attached. As we view the telegram, appellant undertakes to honor or pay Gillman's draft to any one who will furnish Gillman the goods specified for the Camden Tool & Supply Company. The manifest purpose of the telegram was to enable Gillman to procure and have shipped to the Camden Tool & Supply Company, the appellant's customer, the goods mentioned in the telegram. Doubtless the appellant had in mind to enable Gillman to refer the dealers with whom he was negotiating for the purchase of the iron pipe to the Commercial State Bank of Cisco, Texas, as to his reliability and solvency. This is evidenced by the original undertaking of the appellant to pay Gillman's draft for the iron piping purchased by him to any one who might furnish him such piping for the Camden Tool & Supply Company, for whom Gillman, the broker, was negotiating the purchase. The telegram was not in the nature of a special guaranty addressed only to the Commercial State Bank of Cisco, for that bank was not engaged in the business of buying and selling iron pipe, and the telegram was not couched in language which indicated that the appellant would honor the draft only if drawn in favor of the Bank of Cisco. Appellant evidently did not expect the Cisco bank to furnish the money to Gillman to pay for the piping, nor was the telegram

couched in language that indicated that Gillman was expected to buy the piping from any particular dealer, but it was an original undertaking to pay any shipper or dealer who, as we have already stated, would furnish the goods to Gillman upon the terms mentioned in the telegram. There is nothing in the telegram to indicate that appellant intended to repose any special confidence or trust in the Commercial State Bank of Cisco in connection with the negotiations and that it intended to be responsible alone to that bank. It follows from what we have said that the appellant, by reason of this telegram, rendered itself liable to appellee, who, as the proof shows, acted upon the telegram and complied strictly with the conditions in selling and shipping the piping.

In *Falls City Construction Co.* v. *Boardman*, 111 Ark. 415, 163 S. W. 1134, we quoted from 20 Cyc. p. 1407 (3) in parts as follows: "Where the transaction is not merely an offer to guarantee the payment of debts and amounts to a direct promise of guaranty, all that is necessary to make the promise binding is that the promisee should act upon it; he need not notify the promisor of his acceptance." And further, at page 1409, "where there has been a precedent request for the guaranty, notice of its acceptance need not be given to the guarantor." Here the promisee, under this instrument, as we have seen, was any one who acted upon the instrument and sold the goods in reliance upon the good faith of the promise. The promise on the part of the appellant was not a mere proposal, but an absolute guaranty to pay, and the draft for the amount of the purchase price of the piping was drawn in favor of the Commercial State Bank of Cisco with shipper's order bill of lading attached, and forwarded to appellant bank for collection. No further notice therefore to the appellant was necessary of the acceptance of the promise by the appellee. Appellee's act in selling and delivering the piping, according to the terms of the guaranty, was itself an acceptance, and furnished the consideration on

appellee's part essential to make the promise binding on the part of appellant to pay the purchase price. See *Beeson* v. *La Vasque,* 144 Ark. 522, 223 S. W. 355; *York* v. *Powell,* 125 Ark. 597, 187 S. W. 628; *McCarroll* v. *Red Diamond Clothing Co.,* 105 Ark. 443, 151 S. W. 1012, 43 L. R. A. N. S. 475; *American National Bank of Macon, Ga.,* v. *Pillman,* 176 Mo. App. 430, 158 S. W. 433, 2 Cyc. 1405.

The appellant had no right to cancel the guaranty after the appellee had shipped the goods and the draft had been drawn in payment therefor and sent to appellant. The guaranty took effect and became enforceable and complete after it was acted upon by the appellee in selling and shipping the goods specified according to the terms as therein expressed. After the appellee had thus accepted the guaranty on his part, the appellant could not cancel and revoke the same. This was not a continuing guaranty, but one that was fully consummated by the acceptance and shipment of the goods by appellee. We are convinced that the appellee did not waive his right to recover on the guaranty by stopping the car *in transitu* after he ascertained that the draft for the purchase price would not be honored by the appellant. After the appellant had thus breached its contract with the appellee, the latter was justified in stopping the car *in transitu* in order to minimize, as far as possible, the damages that had accrued to him by reason of the violation of the contract on the part of appellant. Neither did appellee waive his right of action on the original guaranty by permitting the car to go forward after he had been advised by the appellant to let the shipment proceed and that the appellant would honor the draft when the shipment reached its destination. The appellee testified on this issue as follows: "After payment of the draft was refused, I stopped the car about June 16. We had notice verbally from the Ouachita Valley Bank, in a conversation with Mr. Brown, that he was not paying the draft, and, acting upon that, I stopped the car. I told Mr. Brown that he could not cancel the guaranty, as there was no time limit.

He stated that it was due to a misunderstanding with Mr. Gillman on another shipment, which had been attached by some other firm. He stated that they were not going to make any more bank guaranties, but he said if we would allow our shipment to come forward he would pay on arrival. We stopped the car at Fort Worth to minimize our prospective loss. Under the contract of sale we delivered the pipe f.o.b. cars, Gorman, Texas. Mr. Gillman was in receipt of a wire sent to Dallas guaranteeing the freight to and from Camden from Gorman, Texas, dated June 21, 1923. I received that telegram, and then allowed the shipment to go forward. After we received notice that the car was in Camden, we sent a representative, who presented the original draft to Mr. Brown of the Ouachita Valley Bank, and the draft was not paid on this presentation, nor was the freight paid by the bank.''

This testimony by the appellee was clearly sufficient to warrant a finding that he had not waived his right of action for damages for breach of the original warranty. The right of the appellee against the appellant, under the contract of guaranty as we construe it, became complete after he had sold and delivered the piping free on board the cars at Gorman, Texas, consigned to the Camden Tool & Supply Company at Camden, Arkansas, the same being inspected by Gillman and a draft drawn on the Camden Tool & Supply Company for the purchase price with shipper's order bill of lading attached to the draft, the bill of lading being indorsed by Gillman, evidencing the fact that he had inspected and accepted the piping. The appellee had then complied with the contract of guaranty on his part, and the appellant, by refusing payment of the draft, violated its contract, and was liable to the appellee, the only party in interest, for the resultant damages. The amount of the judgment for such damages, as entered by the court, is warranted by the evidence adduced.

We find no reversible error in the record, and the judgment is therefore affirmed.